UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Crim. No. 16-167 |
| BRIAN LITTLE, | OPINION |
| *Defendant*. | |

**ARLEO, UNITED STATES DISTRICT JUDGE**

Before the Court is Defendant Brian Little's ("Defendant" or "Little") motion to suppress evidence recovered from his automobile on August 24, 2015. ECF No. 17. Because Little was stopped on the basis of an unreliable, nonspecific tip and there was no other reasonable suspicion for the stop and seizure, the subsequent search violated the Fourth Amendment. For the reasons that follow, the motion will be **GRANTED**.

**I.   BACKGROUND**

On March 29, 2016, a grand jury indicted Little on one count of possessing a firearm after having been previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 2. ECF No. 1. He was arraigned on May 19, 2016 and entered a plea of not guilty. ECF No. 10.

On October 28, 2016, Little filed a motion seeking, among other things, suppression of a firearm and ammunition seized from his automobile during a warrantless search on August 24, 2015. At a three day evidentiary hearing, the Court heard testimony from two of the arresting officers, Tremayne Phillips ("Phillips") and Tauron Hinnant ("Hinnant") (together, the "Detectives"); the sergeant who took the anonymous tip that led to Little's arrest, Anthony

Venancio ("Venancio"); and the supervisor who relayed the tip to the arresting officers, Joseph Conzentino ("Conzentino") (collectively, the "Officers"). Jamie Sowers, an eyewitness and friend of Little, also testified. Following the hearings, the Court received post-hearing briefing from the parties. ECF Nos. 27-30.

## II.    FINDINGS OF FACT[1]

The Newark Police Department operates a Crime Stoppers hotline.[2] 4/12/17 Tr. 5:17-18. Crime Stoppers is a privately funded program that receives anonymous tips and, if the tip results in an arrest, pays out an award to the tipster. 4/12/17 Tr. 8:1-9:6. There appears to be a somewhat discretionary procedure for how a "tip" is received and disseminated. When a tip comes in, it is routed to the Crime Stoppers desk. 4/12/17 Tr. 11:3-4, 11:8-13. Since tips can come in at any time of day or night, the tip is re-routed to the Crime Stoppers supervisor's cell phone if no one is operating the land line at that time. 4/12/17 Tr. 11:3-16.

When a tip comes in, a Crime Stoppers officer will talk to the caller, may or may not take notes, but ultimately will input the information into an electronically prepared "Crime Stoppers Report," or direct a subordinate to do so. 4/12/17 Tr. 10:9-25, 21:24-22:2, 24:8-26:6. This Report provides space for the officer to record certain details about the tip, such as the type of offense reported; the location of the offense; any physical descriptions of the suspect; the make, model, and license plate number of the suspect's vehicle; and a description of the firearm, if any. See Crime Stoppers Report, Ex. D-9. The tip is then relayed via email, fax, or departmental mail to a

---

[1] At a suppression hearing, as the finder of fact, a trial court determines the credibility of witnesses and may accept or reject any or all of a witness's testimony. United States v. Howard, 787 F. Supp. 2d 330, 331-32 (D.N.J. 2011); see also United States v. McBride, 376 F. App'x 232, 238 (3d Cir. 2010).

[2] The Newark Police Department also operates a "Gun Stoppers" hotline, but both hotlines route to the same phone, so the Court will refer to the programs collectively as "Crime Stoppers." See 4/12/17 Tr. 12:4-14.

supervising officer at the Police Department. 4/12/17 Tr. 24:21-25:15, 28:14-29:2, 47:7-48:3. The tip may also be relayed to the supervising officer via telephone. 4/12/17 Tr. 25:10-26:1, 26:14-23, 28:14-29:2. Finally, the supervising officer will provide the information to those on patrol. 3/28/17 Tr. 9:1-10:15, 119:11-13. There is no set protocol, and the officers decide how best to disseminate the information, which may be time-sensitive. 4/12/17 Tr. 26:4-6, 26:14-23, 47:7-48:3.

At 8:23 p.m. on the evening of August 24, 2015, Sergeant Venancio—who, at the time, was in charge of the Crime Stoppers desk—received an anonymous tip. See Crime Stoppers Report; 4/12/17 Tr. 18:2-3. He or a subordinate prepared a Crime Stoppers Report, which read: "Tipster stated the driver of the Red Chevy Impala is a Black male and he has a handgun in the vehicle." Crime Stoppers Report. The Report also indicated a location of "[South Orange Avenue] and S. 19th St." and listed the type of offense as "Gun." Id. The Report included no other identifying information about the vehicle or driver, even though it had specific sections to enter information about, for example, the suspect's vehicle's license plate. See id.

According to the Report, by 8:29 p.m., Venancio had relayed the tip to Sergeant Conzentino via phone and email. 4/12/17 Tr. 24:21-25:15; Crime Stoppers Report. The one-line email conveys the same essential information that is contained in the Crime Stoppers Report: "So orange and so 19th suspect armed with a handgun in a red Impala right now." Exs. D-7, D-8. There is no mention of a license plate or any other identifying information in the email, either. Conzentino then orally relayed the information to Detectives Hinnant and Phillips, who were at the police station. 3/28/17 Tr. 9:1-23, 14:4-15:8, 39:2-11, 98:1-11. The Detectives did not write down any information about the tip; they committed it to memory. 3/28/17 Tr. 15:5-17, 98:12-22. And both Venancio and Conzentino testified that they could not recall whether the tip included

3

any additional information, such as information about a partial license plate number. 4/12/17 Tr. 36:4-38:18, 51:17-21.

The Detectives left the Police Department in the same vehicle, with Hinnant driving, in search of the vehicle in the vicinity of the tip. 3/28/17 Tr. 12:5-11, 99:1-10. The area was known to law enforcement as a high-crime area, and Hinnant and Phillips had previously made narcotics and firearms arrests there. 3/28/17 Tr. 11:12-20. At approximately 8:45 p.m., Hinnant and Phillips identified a red Impala with a black male driver (Little) in the vicinity of South Orange Avenue and South 19th Street. 3/28/17 Tr. 99:11-16. In addition to Little, there were two other passengers in the car. 3/28/17 Tr. 72:7-13.

Little had pulled over on his own on the northbound side of South 20th Street, near South Orange Avenue, when Hinnant and Phillips' vehicle pulled directly in front of the Impala. 3/28/17 Tr. 17:6-8, 20:3-5, 20:8-17, 130:2-10, 131:6-11; 4/4/17 Tr. 24:19-26:3. At around the same time, two more police vehicles pulled up behind Little, boxing him in and making it impossible for him to leave. 3/28/17 Tr. 24:1-13, 67:2-3, 68:7-9, 69:22-25, 70:7-8, 104:13-15, 148:4-7; 4/4/17 Tr. 24:19, 25:4-12, 25:13-16.

Hinnant and Phillips immediately exited their vehicle and quickly walked towards Little's car. 3/28/17 Tr. 20:25-21:1, 66:19-23, 80:12-15; 4/4/17 Tr. 26:5-7. The Detectives were wearing vests that said "Police" across the chest, and also wore their detective badges. 3/28/17 Tr. 5-7. As they approached, Phillips ordered Little to put his hands up, and he immediately complied. See Incident Report at 2, Ex. D-1; 3/28/17 Tr. 141:22-142:20; 4/4/17 Tr. 28:18-29:16, 31:24-32:3, 86:10-22.

Once they reached the vehicle, Hinnant and Phillips ordered Little and the two passengers out of the car. 3/28/17 Tr. 25:23-26:14, 80:21-81:82:10, 106:24-107:5. Little and the passengers

4

were directed to sit on the curb behind the vehicle. 3/28/17 Tr. 32:12-21. Officers then proceeded to search the vehicle, in which they found a loaded pistol. 3/28/17 Tr. 26:19-25, 107:15-20; 4/4/17 Tr. 30:3-19, 32:10-22. Little was arrested, and the passengers were released. 3/28/17 Tr. 36:9-20, 106:13-17, 109:18-21. Little was transported to the Newark Police Department headquarters and charged with unlawful possession of a firearm and ammunition, and received summonses for driving with illegally tinted windows and for not wearing a seatbelt. 3/28/17 Tr. 33:8-14, 34:10-12, 36:6-8, 153:18-20.

Later that night, Detective Hinnant prepared an Incident Report. See Incident Report, Ex. D-1. The following day, the Newark Police Department paid $1,000 to the anonymous tipster. 4/12/17 Tr. 32:20-33:4; Ex. D-12.

### III. CONCLUSIONS OF LAW

The Fourth Amendment protects the public from "unreasonable searches and seizures." U.S. Const. amend. IV. To prevail on a motion to suppress, a defendant generally "bears the burden of establishing that his Fourth Amendment rights were violated." United States v. Correa, 653 F.3d 187, 190 (3d Cir. 2011). However, if the defendant meets his burden to show that the search was conducted without a warrant, "the burden shifts to the government to show that the search or seizure was reasonable." United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995). The applicable burden is proof by a preponderance of the evidence. United States v. Matlock, 415 U.S. 164, 178 n.14 (1974).

The Government argues that the stop of Little's vehicle was permissible under the Fourth Amendment because it was an appropriate Terry stop, which allows an officer to "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)).

5

To determine whether an officer possessed reasonable suspicion to conduct a Terry stop, the Court must "first pinpoint the moment of the seizure and then determine 'whether that seizure was justified by reasonable, articulable facts known to [the officer] as of that time that indicated that [the suspect] was engaged in criminal activity.'" United States v. Lowe, 791 F.3d 424, 430 (3d Cir. 2015) (quoting Johnson v. Campbell, 332 F.3d 199, 205 (3d Cir. 2003)). "Reasonable suspicion is 'a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.'" United States v. Brown, 765 F.3d 278, 290 (3d Cir. 2014) (quoting Wardlow, 528 U.S. at 123). This analysis requires courts to consider "the totality of the circumstances—the whole picture." United States v. Brown, 448 F.3d 239, 247 (3d Cir. 2006) (quotations omitted).

After reviewing the evidence and assessing the credibility of the witnesses, the Court concludes that the traffic stop and vehicle search were in violation of the Fourth Amendment, and that the evidence must be suppressed as "fruit of the poisonous tree." Id. at 244 (quotation omitted).

### A. When did the seizure occur?

The Court begins the Fourth Amendment analysis by determining when the seizure of Little occurred, because "that is the moment 'the Fourth Amendment becomes relevant.'" Id. at 247 (quoting Terry, 392 U.S. at 16). "A seizure occurs when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.'" Lowe, 791 F.3d at 430 (quoting Brown, 448 F.3d at 245). "'[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.'" Brown, 448 F.3d at 245 (quoting

California v. Hodari D., 499 U.S. 621, 628 (1991)). If a suspect fails to submit to the show of authority, no seizure has occurred. See Lowe, 791 F.3d at 430-31, 433.

The Court finds that Little was seized when several police units converged on his car and boxed him in.[3] First, there was a show of authority—when a vehicle is pinned by officers, such action would likely convey to a reasonable person in the vehicle that "he was being ordered to restrict his movement." Brown, 448 F.3d at 245 (quotation omitted). Little also submitted to the Officers' show of authority. When, as here, "a stationary suspect reacts to a show of authority by not fleeing, making no threatening movement or gesture, and remaining stationary, he has submitted under the Fourth Amendment and a seizure has been effectuated." Lowe, 791 F.3d at 434.[4] And indeed, numerous courts have held that when officers block an individual's vehicle from leaving and the suspect does not attempt to flee, a seizure has occurred. See, e.g., United States v. Jones, 678 F.3d 293, 302 (4th Cir. 2012) (holding that "when an officer blocks a defendant's car from leaving the scene, particularly when, as here, the officer has followed the car, the officer demonstrates a greater show of authority than does an officer who just happens to be

---

[3] Hinnant and Phillips testified that the Officers did not "box in" Little's vehicle, and that he could have driven away if he wished. There was conflicting testimony about this fact at the hearing—including between Hinnant and Phillips, Phillips himself, and the Detectives and third party witness Jamie Sowers. See 3/28/17 Tr. 20:3-17, 130:2-10, 131:6-11; 4/4/17 Tr. 24:19, 25:13-16. The Court finds that when the Officers converged on Little's vehicle, they boxed him in and prevented him from leaving.

[4] Phillips testified that when he approached the vehicle, he observed Little reach towards his waistband and then below his seat. 3/28/17 Tr. 22:1-7, 27:4-10, 74:2-13; see also Incident Report at 2. Yet there was conflicting testimony as to this fact at the hearing. See 3/28/17 Tr. 22:1-7, 27:4-10, 74:2-13; 4/4/17 Tr. 28:18-29:16, 31:24-32:3, 86:10-22. In addition, Phillips' assertions are belied by common sense. It is implausible that Little would have been driving with such a large weapon (at least eight inches in length and extremely heavy) tucked into his waistband. 3/28/17 Tr. 4-8; Ex. G-301. And it is nearly impossible to believe that, if the Detectives truly witnessed a person whom they believed to be armed making frantic gestures consistent with reaching for a gun, they still did not, as they claimed at the hearing, draw their service weapons. See 3/28/17 Tr. 28:8-14, 65:14-73:23. Therefore, the Court finds that the Government did not meet its burden to show that Little made any furtive gestures as the Detectives approached his car.

on the scene and engages a citizen in conversation"); United States v. Jones, 562 F.3d 768, 772 (6th Cir. 2009) ("Here, by blocking in the Nissan, the officers had communicated to a reasonable person occupying the Nissan that he or she was not free to drive away."); United States v. Kerr, 817 F.2d 1384, 1387 (9th Cir. 1987) (holding that a defendant was seized because his "freedom to depart was restrained at the moment [the officer] blocked the one-lane driveway"); United States v. Pavelski, 789 F.2d 485, 488 (7th Cir. 1986) ("A reasonable person in this situation, bounded on three sides by police patrol cars, would not have believed that he was free to leave."); see also Pane v. Gramaglia, 509 F. App'x 101, 103 (2d Cir. 2013).

Yet even if Little was not seized when his vehicle was boxed in, he was certainly seized when he immediately complied with Phillips' order to show his hands. Once Hinnant and Phillips stopped, they exited their vehicle, quickly proceeded towards Little's car while in uniform, and ordered him to put his hands in the air. Little immediately raised his hands.[5] This compliance with the Officers' show of authority unquestionably constituted a seizure. See, e.g., Brown, 448 F.3d at 246 (holding that when the defendant turned to face the police car and moved to place his hands on the vehicle, it constituted compliance with a show of authority and amounted to a seizure); United States v. Bey, No. 16-290, 2017 WL 875364, at *7 (E.D. Pa. Mar. 6, 2017) (holding that the defendant complied with the officers' show of authority when he turned around with his hands raised); Verdier v. Borough, 796 F. Supp. 2d 606, 623 (E.D. Pa. 2011) (holding that the defendant submitted to the officers' show of authority when he complied with orders to put his

---

[5] Phillips also stated at the hearing that Little did not immediately raise his hands despite several orders. 3/28/17 Tr. 22:16-20, 27:7-14. Yet this claim is contradicted by the Incident Report, which states that after Phillips gave the order, Little "immediately popped back up erect in his seat and complied with Detective Phillips['] commands." Incident Report at 2. And there was conflicting testimony from Sowers, who testified that when Phillips ordered Little to put his hands in the air, he immediately put his hands on the steering wheel. 4/4/17 Tr. 28:18-29:16, 31:24-32:3, 86:10-22. The Court finds that Little immediately raised his hands when ordered to do so.

8

hands on the car's window or door). And Little's compliance was not momentary—he was immediately removed from the vehicle, searched, and seated on the curb without incident.

Therefore, Little was seized, at the very latest, when he complied with Phillips' order to put his hands in the air.

**B. Was the stop supported by reasonable suspicion?**

The Government has not met its burden to show that at the time Little was seized, the officers possessed a reasonable, articulable, and individualized suspicion that he was engaged in criminal activity.

The Government first contends that the seizure was justified because Little's windows were illegally tinted and he was not wearing a seatbelt, both in violation of New Jersey law. Yet the Court does not find credible the Detectives' testimony that they observed Little's tinted windows and seatbelt violation *prior to* the seizure.[6] Although it is true that any technical violation of a traffic code justifies a stop, even if the stop is merely pretext for an investigation of some other crime, the Third Circuit has made clear that "a contrived, after-the-fact explanation" for a stop is insufficient. United States v. Lewis, 672 F.3d 232, 238 (3d Cir. 2012). As the circuit has explained:

> Needless to say, a pretextual traffic stop requires the officer to have observed a traffic violation prior to initiating the traffic stop.

---

[6] At the hearing, Detectives Hinnant and Phillips claimed that they observed Little's tinted windows and seatbelt violation prior to the stop. See 3/28/17 Tr. 37:19-38:5, 59:15-18, 122:23-24. Yet the Incident Report does not indicate that either Hinnant or Phillips observed Little's tinted windows or seatbelt violation *prior* to the stop. In fact, despite including painstaking detail regarding other aspects of the incident, the only mention of the traffic violations is the last sentence of the report, which states that "Brian Little was also issued summonses for tinted window and failure to wear seatbelt." Incident Report at 2. In his testimony, Hinnant acknowledged that the report did not specify that he or Phillips had observed the traffic violations prior to the stop, and stated that "[i]f [the traffic violations were] the probable cause I used to actually pull the car over, then maybe I would have indicated it earlier in the report." 3/28/17 Tr. 126:4-128:20. The Court finds that the Detectives did not observe Little's traffic violations prior to the stop.

9

> Otherwise, the officer's motivation for the stop could not be pretextual. The corollary of this fundamental principle is that *ex post facto* justifications are impermissible.

Id. at 237; see also United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993) (en banc). That is what happened here. Because the Detectives did not credibly establish that they observed the traffic violations prior to the seizure, the violations did not justify the stop.

Next, the Government argues that the anonymous Crime Stoppers tip provided a sufficient basis for the stop. "When a Terry stop is based on a tip provided by an informant, [the court] must scrutinize the informant's 'veracity, reliability, and basis of knowledge' to determine whether the information relied upon by the police was sufficient to establish reasonable suspicion for the stop." United States v. Johnson, 592 F.3d 442, 449 (3d Cir. 2010) (quoting United States v. Torres, 534 F.3d 207, 210 (3d Cir. 2008)). The following aspects of a tip indicate reliability:

> 1. The tip information was relayed from the informant to the officer in a face-to-face interaction such that the officer had an opportunity to appraise the witness's credibility through observation.
>
> 2. The person providing the tip can be held responsible if her allegations turn out to be fabricated.
>
> 3. The content of the tip is not information that would be available to any observer . . . .
>
> 4. The person providing the information has recently witnessed the alleged criminal activity.
>
> 5. The tip predicts what will follow, as this provides police the means to test the informant's knowledge or credibility . . . .

Torres, 534 F.3d at 211 (citing Brown, 448 F.3d at 249); see also Alabama v. White, 496 U.S. 325, 329 (1990) (setting forth several considerations for a tip's reliability). Although each of these factors is relevant, "no single factor is dispositive or even necessary to render an informant's tip reliable." Johnson, 592 F.3d at 449.

Based on these considerations, the Court holds that the tip did not carry sufficient indicia

of reliability and did not provide the officers with reasonable suspicion to make the stop. The Supreme Court's decision in Florida v. J.L., 529 U.S. 266 (2000) is particularly instructive. In J.L., an anonymous caller reported to the police that a "young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." Id. at 268. The Court held that given the anonymous source and lack of predictive information, the tip was unreliable and did not establish reasonable suspicion to justify a Terry stop. Id. at 270-71. And the Third Circuit recently came to a similar conclusion in United States v. Lowe, where the court considered whether "an anonymous tip that a male matching [the defendant's] description was [in possession of a gun], the fact that 914 North Markoe Street was located in a high-crime neighborhood in which a shooting had occurred over an hour earlier, [and] the late hour of the night" created reasonable suspicion. 791 F.3d at 434-35. Relying on J.L., the court reasoned that it did not, because the tip carried almost no indications of reliability and did little more than pinpoint the identity and location of the defendant. Id. at 435 n.7.

Similarly here, the anonymous tip carried virtually no indicia of reliability. The tip was anonymously relayed through the Crime Stoppers hotline, which prevented Sergeant Venancio from assessing the credibility of the caller face-to-face and ensured that the source could not be held accountable if the allegations were incorrect. See J.L., 529 U.S. at 275 (Kennedy, J., concurring) ("If the telephone call is truly anonymous, the informant has not placed his credibility at risk and can lie with impunity."). In addition, the anonymous caller did not identify the basis of his or her knowledge that Little possessed a gun, or indicate whether he or she had actually witnessed any criminal activity by Little. See id. at 271 (majority opinion) (finding unreliable a tip by "an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information" about the defendant).

11

And the tip did not contain much, if any, predictive information that the officers could have corroborated prior to the stop and search. See id. (holding that an anonymous tip was unreliable because it "provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility").[7]

While the tip was accurate in the sense that the officers could correctly identify the subject of the tip, the Supreme Court has stressed that the reasonable suspicion analysis "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." J.L., 529 U.S. at 272; see also Lowe, 791 F.3d at 435 n.7 (noting that corroboration of "basic descriptions of [the defendant's] location and appearance" is not enough to render a tip reliable); Thompson v. Wynnewood of Lower Merion Twp., No. 12-2308, 2012 WL 4033706, at *5 (E.D. Pa. Sept. 13, 2012) (same). And although the tip was relayed at nighttime and the location was in a high-crime area, such facts are insufficient to transform an otherwise unreliable tip into a legitimate basis for a stop. See Lowe, 791 F.3d at 434-35. In sum, as in J.L. and Lowe, this is "not even a 'close case'"—the tip clearly did not provide reasonable suspicion to stop the vehicle. Id. at 435 (quoting J.L., 529 U.S. at 271).[8]

---

[7] It bears emphasizing that the tip was extremely bare-boned—it just identified a black male with a gun, in a red Impala, in a particular area. Although Detectives Hinnant and Phillips testified that the anonymous Crime Stoppers tip also stated that the Impala bore a partial license plate of "B13," the Court does not find this claim credible. 3/28/17 Tr. 9:1-4, 15:7-8, 35:18-20, 94:16-20, 144:18-20; see also Incident Report at 1. That information was not included in either the Crime Stoppers Report or Venancio's email to Conzentino, the two documents created contemporaneous with the receipt of the tip. See Exs. D-7, D-9. In addition, the Detectives testified that despite the fact that the tip was orally relayed to them at the police station, they never wrote the information down anywhere. 3/28/17 Tr. 15:5-17, 98:12-22. And although Venancio and Conzentino testified that they could not recall whether the tip included information about a partial plate, Venancio acknowledged that such information, if received in a tip, would be an important piece of identifying information and there is no reason why it would be omitted from the email or report. 4/12/17 Tr. 36:4-38:18, 51:17-21. The Court finds that the tip did not include a partial plate.

[8] The Court notes that, as the Third Circuit recognized in Lowe, "[o]fficers proceeding on the basis of an anonymous tip that does not itself give rise to reasonable suspicion have many tools at their

Because the Government has not met its burden to demonstrate that the stop was supported by a reasonable, articulable, and individualized suspicion that Little was engaged in criminal activity,[9] the subsequent search of the vehicle was necessarily improper, and the evidence must be suppressed.

## IV. CONCLUSION

For the foregoing reasons, Little's motion to suppress the evidence seized from his automobile on August 24, 2015 is **GRANTED**. An appropriate Order follows this Opinion.

**Dated: August 8, 2017**

                                                 */s Madeline Cox Arleo*
                                                 **MADELINE COX ARLEO**
                                                 **United States District Judge**

---

disposal to gather additional evidence that could satisfy the requirements of Terry and therefore allow police to stop the individual under appropriate circumstances." 791 F.3d at 436. Yet here, once Little pulled over to the side of the street, the Officers did not do any additional surveillance or investigation before effectuating the seizure. See 3/28/17 Tr. 121:14-19.

[9] As the reasonable suspicion analysis requires courts to consider the totality of the circumstances, the Court notes for the sake of completeness that all of the factual circumstances here, when viewed together, did not amount to reasonable suspicion.

13